# IN THE COURT OF APPEALS OF IOWA

No. 21-0968
Filed January 27, 2022

**IN THE INTEREST OF J.L.,**
**Minor Child,**

**S.C. and K.C.,**
    Intervenors-Appellants,

**E.S.,**
    Intervenor-Appellee.

_____

Appeal from the Iowa District Court for Dubuque County, Thomas J. Straka, Associate Juvenile Judge.

The intervenor-maternal relatives of the child appeal the juvenile court ruling removing the Iowa Department of Human Services as the guardian of the child and appointing the intervenor-foster parent instead. **AFFIRMED.**

Cathleen J. Siebrecht of Siebrecht Law Firm, Des Moines, for intervenors-appellants.

Patricia Reisen-Ottavi, Dubuque, for intervenor-appellee.

Thomas J. Miller, Attorney General, and Ellen Ramsey-Kacena, Assistant Attorney General, for appellee State.

Kristy L. Hefel, Public Defender Supervisor, Dubuque, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Badding, JJ.

**GREER, Judge.**

A "forever home" decision warrants more thought than the rote application of a rule. The juvenile court, evaluating the process used for an adoption placement, agreed. It all began when the juvenile court terminated the parental rights of J.L.'s biological mother and father in September 2020 and appointed the Iowa Department of Human Services (DHS) the guardian of the child. Shortly after, the intervenor-foster parent and the guardian ad litem (GAL) each filed a motion to remove DHS as guardian. Following a hearing in spring of 2021, the juvenile court concluded DHS acted unreasonably in discharging its duties as guardian to find a suitable adoptive home for the child, granted the motions to remove DHS, and appointed the intervenor-foster parent as guardian instead.

The intervenor-maternal relatives, who DHS had chosen as the pre-adoptive placement for J.L., appeal the juvenile court's ruling.[1] They challenge the court's decision to remove DHS as guardian and argue the juvenile court improperly usurped DHS's role by substituting its judgment for that of DHS.

---

[1] The State, representing DHS, also takes the position the court's ruling is in error, but the State failed to file a notice of appeal. As an appellee, it cannot challenge the adverse ruling on appeal; so we consider neither its position nor its written response. *See Brutsche v. Inc. Town of Coon Rapids*, 264 N.W. 696, 699 (Iowa 1936) ("It seems to be the settled rule in this state that one party cannot avail himself of an appeal prosecuted by the other party to ask a review of that portion of the judgment adverse to himself."); *see also Becker v. Cent. States Health and Life Co.*, 431 N.W.2d 354, 356 (Iowa 1988) ("Failure to [appeal or] cross-appeal on an issue decided adversely to an appellee . . . forecloses the [party] from raising the issue on appeal."), *overruled on other grounds by Johnson Equip. Corp. v. Indus. Indem.*, 489 N.W.2d 13, 16 (Iowa 1992); *cf. State v. Hagan*, 840 N.W.2d 140, 144 n.3 (Iowa 2013) (concluding the appellee did not preserve an issue for appeal because he "did not file an appeal or cross-appeal on the issue").

**I. Background Facts and Proceedings.**

Even before J.L.'s birth in September 2019, DHS contacted the child's maternal relatives[2] to gauge their interest in becoming his possible adoptive family.[3] The relatives lived in Florida and were already caring for J.L.'s maternal half-siblings.[4] They anticipated adopting those children and responded they were willing to adopt J.L. if the need arose.

J.L. was removed from his parents' care a few days after his birth and placed with a local licensed foster parent, E.S. The foster parent was told J.L.'s relatives expected to adopt him and that the child would likely be in her care for just six months—until termination took place. *See* Iowa Code § 232.116(1)(h) (2020). But the expected termination did not proceed on schedule.

During the first six months of the child's life, the aunt and uncle had no contact with the foster parent or the child.[5] Then, from March to June 2020, the foster parent facilitated monthly video calls between J.L and the relatives in Florida. The aunt was supposed to come to Iowa to meet J.L. in person in June 2020, but one of the family members contracted COVID-19 and the trip had to be cancelled.

---

[2] The biological mother's sister and brother-in-law will be referred to as J.L.'s "aunt" and "uncle" in this opinion.

[3] J.L.'s mother is reported to function at the developmental level of a seven year old. His father is on the sex offender registry and has a history of perpetrating domestic violence. It was anticipated they would not be able to care for J.L. after his birth.

[4] The maternal half-siblings were removed from the mother's care while she lived in Kansas—before she moved to Iowa. DHS and the Iowa courts took no part in those children's placement or the decision as to the mother's parental rights regarding them.

[5] The foster parent testified she expected to have contact with the relatives and thought they would come meet J.L., but "[t]here were no e-mails, no messages, no visits." After having no contact from the aunt and uncle in the first six months, the foster parent requested consideration for adoption.

The termination trial took place in August 2020, and the aunt attended in person. While in Iowa for a few days, she spent approximately thirty minutes with the child. The uncle and the half-siblings remained in Florida.

The juvenile court ordered the termination of parental rights in September—approximately one year after J.L. came to live with the foster parent. By this point, the foster parent also wanted to be considered for J.L.'s adoptive placement.

The same month, the foster parent took the child to a therapist, Yvette Saeugling, for an assessment of the foster parent's bond with the child.[6] Saeugling administered the Marschak Interaction Method, which—according to her report—"is an assessment utilized world wide" that "may only be administered by a certified Theraplay practitioner through the Theraply Institute." Saeugling, who had "worked in foster care and adoption field for 25 years," later provided a written report in which she opined that J.L. should remain with the foster parent. Saeugling explained:

> My recommendations are that [J.L.] needs to remain with his foster [parent]. Again, I did not know [her] prior to her first appointment. I have had no contact with [the child's] [maternal aunt] and no one has spoken unfavorably about her ability to raise [J.L.] and the environment he would live in. It is important to consider the fact he would be with his half-sisters and they should be an important part of his life.
> The problem becomes that [J.L.] has not spent time with his aunt and uncle nor his siblings. Essentially, he would be entering a home of strangers with no one he could possibly trust yet to help him regulate. Again, this is not about being a "good enough" parent or a very loving parent. He will experience fear and anxiety and will not have established the level of trust needed to self-regulate such a major transition, one of great loss and confusion.

---

[6] The foster parent had a live-in paramour at the time J.L. was placed in her care. During the pendency of these proceedings, the foster parent married the paramour. Saeugling also evaluated the bond between J.L. and the now-husband.

The problem arises is that if [J.L.] would not be able to remain with [the foster parent], [he] would suffer two broken maternal bonds a little over one year apart. It is not a matter of whether he would be affected it is a matter of how he would be affected. Keep in mind, especially at [J.L.'s] age, attachment is about both his psychological and neurobiological well-being. So, essentially a priority of relationships need to be established. At this age, [his] innate need is for a primary caregiver.

Saeugling also recommended a transition plan in case DHS chose to place J.L.

with his family members in Florida:

Any change in primary caregiver is traumatic. A caring transition cannot prevent the trauma of loss, but it is the most effective way to minimize the damage. Failure to transition properly jeopardize[s] the child's continued ability to attach to anyone, including the ability to form a new secure attachment to [the] relative. Because visiting simply is not the same as providing day-to-day care, this includes return to a birth parent or relative who has been visiting consistently and appropriately. There will inevitably be trauma when the child is moved to a different day-to-day caregiver, especially when the child has formed an attachment to the current caregiver.
. . . .
Toddlers:
How often: 2 to 4 visits per week; each 60-90 minutes
Where: Home or homelike environment; doctor appointments
When preparing a child for a new placement or home, it is good to start weeks before the move. Children 8 months to 15 months should have twice as many visits than infants 2-8 months old. These visits should be held no more than 1 to 2 days apart.
Planned transitions involve a very gradual introduction of the child to the new family and an ON-GOING contact with the prior family. Development of a constructive relationship between the two families.
Obviously, transitioning to Florida would be very[,] very difficult. Meeting once or twice a year would not suffice for on-going contact for a child [J.L.'s] age.

On November 6, the GAL submitted a written recommendation to the adoption selection committee,[7] advocating for the foster parent to be chosen as J.L.'s pre-adoptive placement:

> I believe that [J.L.] should be adopted by [the] foster mother, the only mother that he has known since his discharge from the hospital after his birth, and the person that [he] is bonded to and looks to for comfort and security as his mother. I believe that each family would be loving and supportive for [the child]. The [maternal relatives] are very good people and have many fine qualities. The reason that I make my recommendation has nothing to do with [them]. The reason I make my recommendation is based on my concern for the best interest of [J.L.'s] long term mental and emotional well-being. It is my belief that his long-term best interest supersedes placement with his two half-sisters and the maternal aunt due to the potential trauma that another removal would have upon [his] future growth, development and mental health.
> . . . .
> . . . Though both families, the [maternal family] and the [foster parent], are exceptional families, the maternal aunt has had very little personal contact with [J.L.], having come to Dubuque for one in-person visit and video [calls] since the case has begun and birth of [J.L.] due to their residence in . . . Florida. The distance between the families has not only made it difficult for the maternal aunt and family to bond with [the child] and develop a "significant relationship," it will also make any slow transition to their home prohibitive. If the Adoption Selection Committee were to select the maternal aunt's family in Florida, [the child] would likely be removed from the [foster parent] and moved to the maternal aunt's home with very little transition time allowed resulting in confusion and trauma for this small child. Even if a slower transition period occurred, this would still result in a 2nd removal for a one-year old child, once from his mother in the hospital and one time from the foster mother that he identifies as his mother. [The foster parent] has provided him with love, nurturing, and security, resulting in him flourishing in [her] home.
> . . . .
> . . . Even though the [maternal relatives] are related and would have been an excellent choice if [he] could have transitioned to their home soon after birth and established a significant relationship with them, that did not happen.

---

[7] By rule, DHS is required to hold a conference to select an approved family before preplacement occurs. *See* Iowa Admin. Code r. 441-200.4(3)(a). DHS refers to this conference as an "adoption selection staffing."

On November 8, the foster parent submitted Saeugling's report to DHS. She also submitted a letter from J.L.'s pediatrician, who "support[ed] . . . keeping [J.L.] with his foster parents," and noted J.L. had attended all of his medical appointments "with his foster parents often in conjunction with his biological parents." Additionally, the adoptive parents of one of J.L.'s paternal half-siblings, with whom J.L. attended daycare and spent time each day, wrote a letter indicating their support of their foster parents and stating both families intended to continue the familial relationship between the half-sibling and J.L.

The adoption selection committee—consisting of five DHS workers[8]—met on November 9 and interviewed the foster parent and the maternal relatives. The GAL was present to witness but not allowed to actively participate.

The members of the staffing chose the relatives for J.L.'s adoptive placement, and the foster parent was told on November 18. The written decision that was given to the foster parent states she was "given careful consideration and many strengths were noted," but "another family was selected." The record before us contains no other written explanation of the process undertaken by the committee.

DHS planned to transition J.L. to the maternal relatives' home about a week later. In its initial transition plan, the aunt and uncle would fly to Iowa, spend the day with the child, send him back to the foster parent's to sleep that night, and then leave with J.L. for Florida the next day. This was to occur in late November 2020,

---

[8] The workers were the adoption caseworker, the adoption caseworker's supervisor, the previous caseworker, the previous caseworker's supervisor, and the licensing worker.

at which point J.L. was approximately fourteen months old. While the toddler had some interactions with the relatives by way of video calls,[9] he had only ever spent approximately thirty minutes with the aunt in person and had never met the uncle. He would meet his half-siblings in person for the first time when he arrived at the maternal relatives' home in Florida. DHS subsequently revised the transition plan, extending it so the maternal relatives were to arrive on Wednesday, November 24 and then leave with J.L. on Saturday, November 28.

On November 23, the foster parent filed a motion to intervene in the juvenile court's proceedings. In a separate motion, she moved to stay placement transition and to remove DHS as guardian. In asking the court to prevent J.L. from moving to Florida with the maternal relatives, the foster parent outlined that J.L. "ha[d] no bond with his maternal aunt" due to their lack of time together and explained, "DHS has proposed that [J.L.] be transitioned to [the maternal aunt's] care on November 24, 2020, with only a 3.5 day transition period to get to know [her]." The foster parent asserted the plan was "not reasonable" and "fails to consider [the child's] best interests." She asked the court to stay J.L.'s transition to Florida "until a ruling is entered on her motion to intervene and motion to remove DHS as guardian."

The same day, the GAL also moved to stay J.L.'s transition to the maternal relatives' home and asked the court to remove DHS as guardian. Similar to the foster parent, the GAL alleged DHS acted unreasonably in both picking the

---

[9] In her motion, the foster parent asserted J.L. had spent less than three hours on video calls with the relatives, including his half-siblings in their care, during his lifetime.

maternal relatives as a pre-adoptive placement, because the family members were virtual strangers to J.L., and in its transition plan for J.L.

The court granted the motions to stay placement of J.L. and set the other motions for later hearing.

Having already scheduled their trip to Iowa, the aunt and uncle visited from November 24 to November 28 and spent time with J.L. Afterward, the DHS worker set the expectation that a minimum of two video calls occur between J.L. and the maternal relatives in Florida each week. Additionally, the relatives asked that J.L. come spend time in their home in December, which DHS approved, and J.L. spent five days with the relatives in their home in late December and early January 2021.

Before J.L.'s visit, the maternal relatives filed a motion to intervene and asked the court to allow J.L. to be placed in their care pending resolution of the other issues.

The juvenile court granted the motions to intervene of both the foster parent and the maternal relatives. It set the request to remove DHS as the guardian of J.L. for hearing, which ultimately took place over two days: March 26 and May 14. J.L. remained in the care of the foster parent throughout this time.

At the hearing, the adoption social worker—who was one of the workers on the adoption selection committee—was asked questions about the adoption selection process. While the worker specializes in adoptions and has since 2009, she could not name any specialized training she had received for the position and did not know the last time she participated in any training that was specific to adoptions. When asked if she was aware of what factors the committee was supposed to assess under the administrative rules in making its decision, the

adoption worker stated, "I would assume there are codes. I haven't looked at them recently." The worker testified she "didn't know" when asked when she last read the requirements and answered "perhaps" when asked if it had been more than one year. She was confident she did not review the requirements in the week prior to J.L.'s adoption conference.

The adoption worker was also asked what she knew about J.L.'s biological parents. She did not know if they lived in the same city as the foster parent and did not think it was important to know. It was explained that the foster parent continued to supervise contact between the biological parents and J.L. even after termination and that she expressed an intention to keep doing so if she was allowed to adopt. The adoption worker was asked if that bond between J.L. and his biological parents was "relevant" to the adoption selection, and she seemed to deny it was an important consideration, responding, "[T]heir rights have been terminated." Yet the worker agreed that one of the questions that is asked of prospective adoptive families during the home study is whether they intend to allow the biological parents to have ongoing contact with the child after adoption. The maternal relatives indicated they would allow continued contact with the biological mother, and the selection committee considered that a positive. The worker testified, "I mean, it's already part of [the maternal aunt's] family so I guess that would be assuming just a natural relationship. So if there were family gatherings [J.L.] would naturally have contact with the birth parent." But the maternal aunt, while testifying she would allow contact between J.L and the biological mother, admitted to having a "strained" relationship with her sister for the past eight years, and the sisters did not spend time together when the aunt visited Iowa.

Additionally, in the nearly three years the maternal relatives had care of the biological mother's other two children, the mother had never been to Florida to visit and they only "did a couple video chats." And the maternal relatives were not willing to support a relationship between J.L. and the biological father.

At the hearing, there was also testimony that established J.L. was exhibiting some concerning symptoms, including irregular sleeping, inability to be soothed, and aggression towards himself and others—including slapping himself, hitting his head against the wall, and biting and scratching others. The foster parent did not remember seeing any of the behavior until after J.L. returned from his visit with the maternal relatives in Florida, while the maternal relatives testified they witnessed some of the behavior during video calls before J.L.'s visit. Whatever the cause and whenever they started, it was undisputed J.L. was experiencing some issues at the time of the hearing on the motion to remove DHS as guardian. As a result, following J.L.'s eighteen-month wellness check in March 2021, his pediatrician made a referral to psychology. And one of the workers at J.L.'s daycare noticed the same concerning behavior and notified the foster parent. The foster parent in turn provided the information to DHS as the guardian. DHS took no action to follow up with either the pediatrician or the daycare.

The adoption worker was asked about DHS's transition plan for J.L.—how it was initially comprised of J.L. spending just one day with the maternal relatives before leaving with them to Florida—in comparison to the plan outlined by Saeugling. The worker responded, "[B]ut we didn't seek out [the therapist's] position." Then the following exchange took place between the foster parent's attorney and the worker, highlighting the "management decision":

Q. I understand. But do you have any reason to believe that because you didn't seek her out, that her input is any less valid? A. Again, it wasn't our evaluation to be requested.

Q. Are you aware under the Iowa Administrative Code you have an affirmative duty to talk about any counseling issues regarding separation, loss, grief, guilt, anger, and adjustment issues to an adoptive family and the child? A. Yes.

Q. So you're aware that you had that duty, you had a professional who said, hey, I've seen the kid and I've got some thoughts, and you chose to ignore it because you didn't hire her? A. I was—we had discussed a transition plan, and management made the decision. Whether they consulted with another party, I'm not aware, but that's the plan that was discussed with how we would proceed.

. . . .

Q. Okay. [During the adoption selection conference,] [d]id anyone say, hey, what about Ms. Saeugling's recommendation? A. We did not . . . that I'm aware.

Q. . . . [A]t any time during the meeting that you attended, was there a suggestion that if we don't like [Saeugling's] suggestion for transition, we will hire and talk to someone else to make sure we're doing this right? A. Not that I recall.

Q. As the guardian of a child making a permanent lifelong decision, does it appear at least prudent to consider what a very highly regarded child psychologist in the area would say as a transition suggestion? . . . Yes or no? A. Yes.

Q. Okay. With regard to the transition period, did the [GAL] at some point reach out and indicate her level of dissatisfaction with one visit and hand the child over? A. She made a statement that it was short I believe.

Q. What weight was that given? A. I don't know.

. . . .

Q. It wasn't until my client filed a motion to intervene on November 23, which was about the time the [relatives] were coming to Iowa, and the court entered the order that the placement would stay pending hearing, that the original plan . . . was scrapped? A. Correct.

The worker acknowledged her role in J.L.'s case did not begin until October 2020—after termination—and that other people in J.L.'s life had more knowledge about him at the time of the adoption selection conference, such as his foster parent, his pediatrician, the previous caseworker, the GAL, daycare workers, and other professionals who spent time with the child. Through questioning of the worker,

the foster parent's attorney elicited that the GAL and court appointed special advocate (CASA)—whose opinions are to be considered by the selection committee—each believed J.L. should remain with the foster parent. Then the foster parent's attorney asked:

Q. So if every single party that you're required to consult with is recommending that for this particular child at this particular age and with this particular delay in permanency, that he remain here, how is it that none of those were seemingly given any weight? A. They were probably taken into consideration, but the department as the guardian and the team that was part of the consensus made the decision that the child would be placed permanently with the [maternal relatives].

Q. What was your recommendation? A. That the child go with the [relatives].

Q. And what did you base your recommendation on? A. Based on the consensus of the team, . . . it wasn't an individual. We all—I think that we talked about the child, the plan—my understanding was that there was early communication in this case for the child to be placed with relatives. He would—understandably that he is bonded, has formed a bond with [the foster parent], but looking at the long-term best interests of this child, for him to be placed with family and with siblings, I think those were considerations that he be able to remain with family.

Q. Isn't it true that the department felt it needed to honor a prior commitment to place these kids with the [relatives]? A. No.

Q. Isn't it true the department had indicated to them that as family they had preference? A. That may have been. I did not say that, but maybe that was said to them.

Q. With regard to this case, there have been many delays before we got here today, have there not? A. Yes.

. . . .

Q. Okay. And so what might have been the right plan a year ago might not be the right plan today; is that a fair statement? A. It was the decision the department made. It was a consensus based on the things so that's the decision that was made.

Q. I understand. And you keep saying that, but what I want to understand from you is can the department—does the department look at the fact that sometimes circumstances, not the fault of anybody, but just circumstances might have to change a plan in the best interest of a child? A. Sure.

Q. Was that discussed in this case? A. No.

By the second day of the hearing, J.L. had recently been diagnosed with delayed speech. It was hoped that helping him with his speech would also help with some of aggression he was showing. The evaluator recommended J.L. participate in speech therapy and a hearing screening, and the foster parent and DHS were working to set up those appointments.

The juvenile court issued its written ruling in June, granting the motion to remove DHS as guardian and appointing the foster parent J.L.'s guardian instead. The court noted that both families could provide J.L. with a loving and stable home, and neither was an inappropriate placement option. However, the concerns the foster parent and GAL raised as to how DHS arrived at the choice "warrant[ed] further consideration." Pointing to the best-interests-of-the-child factor, the court noted the adoption worker was unaware of the administrative rules that DHS must follow when picking an adoptive family; DHS was unaware that J.L. has relationships with two half-siblings who live in the same city as the foster parent, DHS did not follow up with the pediatrician's or daycare workers' concerns about J.L.'s behavior, and DHS seemed to disregard the opinions of J.L.'s pediatrician and Saeugling just because it did not request those assessments. Additionally, the adoption worker admitted J.L. had not developed a bond with the maternal relatives or his half-siblings in Florida. Yet DHS determined it was in the child's best interests to be placed with those relatives for adoption and to transition immediately to their care. The court concluded:

> [DHS] seems to hang its hat on Iowa Administrative Code section 441.200.4(3)(b)(1) which indicates "Preference shall be given to placing children from the same birth family together." However, this general statement cannot simply be applied to every family without going through the required analysis, including placing

the best interests of the child above all else, as directed. Even this administrative code section relied upon by [DHS] references the best interest of the children.

. . . [DHS] takes a global position that it is in the best interests of the child to be placed with family. But again, this is not the end of the story and cannot reflexively by applied in every circumstance.

Pursuant to its own guidelines, [DHS's] adoptive selection process must include a thorough assessment of each child's current and potential developmental, medical, emotional, and educational needs. [T]his did not occur. So without conducting the required thorough assessment, [DHS] is really in no position to state with any degree of certainty as to what is in the best interests of [J.L.]

. . . .

It appears [DHS] made its decision early on and decided to forego the required complete and thorough assessment. . . .

. . . .

. . . [T]he Department acted unreasonably and irresponsibly in the discharge of its duties as guardian in finding a suitable adoptive home for the child by not following the directives contained in Iowa Administrative Code 441-200.4(3) and in their own guidelines.

The Department simply ignored or gave insufficient weight to the concern and recommendations of the child's pediatrician, the concerns and recommendations noted by the experienced therapist who evaluated the child, the concerns and recommendations of the guardian ad litem, the concerns and recommendations of the CASA volunteer, the concerns noted by the daycare provider, and they did not conduct an appropriate best interests analysis.

The maternal relatives appeal.

## II. Discussion.

When the juvenile court orders termination of parental rights, "the court shall transfer the guardianship and custody of the child to" either:

a. The department of human services.
b. A child-placing agency or other suitable private agency, facility or institution which is licensed or otherwise authorized by law to receive and provide care for the child.
c. A parent who does not have physical care of the child, other relative, or other suitable person.

Iowa Code § 232.117(3). The juvenile court retains the authority to remove the appointed guardian "[u]pon application of an interested party or upon the court's

own motion." *Id.* § 232.118(1). If the court does so—like here—then it must appoint another guardian "in accordance with the provisions of" section 232.117(3). *Id.* We presume the legislature crafted this option for a reason.

Yet, Iowa Code section 232.118 is silent as to what the court should consider when deciding whether to remove a guardian.[10] "In the absence of statutory criteria, this court has examined the reasonableness of the current guardian's actions and the best interests of the child." *In re N.V.*, 877 N.W.2d 146, 150 (Iowa Ct. App. 2016). In doing so, we look at whether "[DHS] in any way failed in its guardianship duties or in looking out for [the child's] best interests." *In re E.G.*, 745 N.W.2d 741, 744 (Iowa Ct. App. 2007); *accord In re S.O.*, No. 13-0740, 2013 WL 3458216, at *2 (Iowa Ct. App. July 10, 2013) ("The juvenile court retains the authority to remove DHS as guardian if the department acts unreasonably or irresponsibly in discharging its duties."). But "[e]ven if [DHS] acted unreasonably in discharging its guardianship duties, we will not reflexively remove [DHS] as guardian under section 232.118 if the removal is not in the child's best interests." *In re I.P.*, No. 19-0715, 2019 WL 3317922, at *2 (Iowa Ct. App. July 24, 2019).

In deciding whether to remove DHS as guardian, the juvenile court cannot:

(1) treat the request for removal of a guardian as a custody battle between the competing possible guardians; (2) conduct a de novo review of the DHS's decision regarding placement and use its own disagreement with the DHS's decision as a basis to remove the DHS as guardian; or (3) exercise veto power over the DHS's placement

---

[10] Our review is de novo in actions seeking to remove DHS as guardian and challenging the child's placement. *See In re E.G.*, 738 N.W.2d 653, 654 (Iowa Ct. App. 2007). We consider both facts and law before adjudicating rights anew. *Id.* We give weight to the juvenile court's findings of fact but they do not bind our conclusion. *Id.* And we give weight to the juvenile court's assessment of credibility of the witnesses. *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).

decision by removing the DHS as guardian if the juvenile court disagrees with it.

*In re N.M.*, No. 20-0898, 2020 WL 5946108, at *3 (Iowa Ct. App. Oct. 7, 2020). In other words, in deciding whether to remove DHS as guardian, the question is not whether the juvenile court would have made the same placement decision as DHS. *See E.G.*, 745 N.W.2d at 744 (reiterating that juvenile courts have the authority to direct the type of placement DHS can make but lack authority to direct a specific placement).

Rather, in the context of this case, the court must focus on the process DHS used and the actions it took in reaching the placement decision and then determine whether those were unreasonable (or irresponsibly undertaken)—all with the best interests of the child in mind. *See, e.g.*, *In re J.H.*, No. 20-0081, 2020 WL 2988758, at *1 (Iowa Ct. App. June 3, 2020) (affirming removal of DHS as guardian because DHS "deviated from the process established under the Iowa Administrative Code and DHS's own policy manual" in making its selection of the adoptive family); *In re T.J.M.*, No. 18-1390, 2018 WL 5840806, at *5 (Iowa Ct. App. Nov. 7, 2018) (concluding DHS should not have been removed for acting unreasonably, where DHS provided a "lengthy statement . . . in support of its [placement] decision" and the decision "was made after considering several relevant factors in an attempt to act in the child's best interests"); *E.G.*, 745 N.W.2d at 744 (concluding DHS should not have been removed as guardian because there was no proof "of unreasonable actions on the part of" DHS and it "conducted an extensive adoption work-up" before selecting an adoptive placement). Yet, even if its process was unreasonable, DHS may have landed on the decision that is in the child's best

interests.[11]  In that case, the court should not remove DHS as guardian.  *See In re A.V.*, No. 16-1749, 2017 WL 104974, at *2 (Iowa Ct. App. Jan. 11, 2017) ("[E]ven though DHS acted unreasonably we will not automatically remove DHS as guardian.").

Here, the GAL and the foster parent—as the ones who moved for removal of DHS as guardian—had the burden to prove DHS acted unreasonably.  *See* Iowa R. App. P. 6.904(3)(e) ("Ordinarily, the burden of proof is on an issue is upon the party who would suffer loss if the issue were not established."); *N.M.*, 2020 WL 5946108, at *3 (requiring the foster parents who moved for the removal of DHS as guardian to prove the requirements for removal were met).  The parties focused on DHS's decision-making process in picking a pre-adoptive placement for J.L. and its lack of meaningful transition plan for J.L. once it decided on the biological relatives who resided in Florida.  The juvenile court concluded the GAL and foster parent met their burden; we agree.

Iowa Administrative Code rule 441-200.4(3)(b)(1) requires that DHS give "preference . . . to placing children from the same birth family together" when picking a pre-adoptive home for a child.  But that preference is not absolute; the choice must still be in the best interests of the child.  *See* Iowa Admin. Code r. 441-200.4(3)(b)(1).  And in determining which family is the best choice for the specific child at issue, the adoption selection staffing must review "[t]he child's special

---

[11] For example, we can conceive of an instance where DHS wrongly applied its own administrative rules in reaching a decision but nonetheless reached the same decision to which proper application would have led—especially when considering that choosing a pre-adoptive placement may, as in this case, involve just two options between which to decide.

needs, characteristics, and anticipated behaviors." *Id.* r. 441-200.4(3)(a). Additionally, DHS's "Iowa Adoption Selection Staffing Process," which was entered an exhibit at the hearing on removal, requires: "The adoptive family selection for a child . . . must be based on a thorough assessment of each child's current and potential developmental, medical, emotional, [and] educational needs."

We agree with the juvenile court that it seems DHS decided early on—possibly even before J.L.'s birth—that the maternal relatives would be his adoptive placement. That early stance is borne out by the maternal relative's arguments on appeal. In support of the decision made by DHS, the aunt and uncle contend DHS informed the foster parent from the beginning that the aunt and uncle would pursue adoption. They point to the foster parent's delay of six months after J.L.'s birth before asking DHS to consider her as a permanent placement option—those same six months when the aunt and uncle made no effort to interact with J.L. or the foster parent. While the plan for the aunt and uncle to adopt J.L. initially made sense, given the rule that preference be given to keeping siblings together, DHS had to reevaluate whether that was still the option that fit J.L.'s best interests at the time of the adoption selection committee when J.L. was fourteen months old and had met his maternal aunt for approximately thirty minutes. *See In re J.E.*, 723 N.W.2d 793, 800 (Iowa 2006) (noting a preference to keep siblings together, but confirming the preference is not absolute because the ultimate concern is the best interests of the child).

From the adoption worker's testimony, it seems the committee ignored all evidence that challenged their choice and blindly relied on other pieces that

supported it.[12] For example, she agreed it was seen as a positive for the maternal relatives that they would keep a relationship between J.L. and the biological mother. But it seems unlikely they actually will, as they have done very little to maintain the relationship between the two children already in their care and the biological mother. *See In re C.M.*, No. 14-1140, 2015 WL 408187, at *4 (Iowa Ct. App. Jan. 28, 2015) ("Although past conduct is not determinative of future conduct, it is probative."). Plus the maternal relatives are not willing to keep in contact with the biological father.[13] On the flip side, the adoption worker was unaware—and did not seem to care—that the foster parent was actively supervising multiple visits each month between both biological parents and J.L. Likewise, the adoption worker had little information about J.L.'s local half-sibling relationships.

> Q. Do [J.L. and his half-sister] have a relationship? A. I don't know.

---

[12] The adoption worker testified :

> Q. You did not contact the doctor who works with him, correct? A. I did not.
> Q. Did you contact the daycare? A. I believe I had one call, but I don't know that it was specific to—it was more when we were trying to set up visits with the [aunt and uncle] about, and I may have asked how [J.L.] was doing during that. But I did not. No, I did not.
> Q. Are you aware that [J.L.] is having behavior problems in daycare? A. Per [the foster parent's] report.
> Q. And you took no steps to follow up with the daycare? A. I did not.
> Q. Okay. And you took no steps to identify and assess current relationship with all current family members of the child? A. No.

[13] Saeugling testified at the hearing and was asked:

> Q. Last question, with [J.L.] we'd not only be disrupting one of the worst developmental ages, but also severing the four primary bonds that he sees, [the foster parent and her husband and] his biological parents? A. Yes. My understanding it sounds like he has a pretty full extended family as well, and I do want to say that will be a loss as well. So his loss isn't just with his primary caretaker or two, that has become his whole world that he is used to. And he'll be very confused as to where they're at as well.

Q. Do they know each other? A. I'm assuming if they see each other at daycare they might, but I don't know that they would understand that they're brother—half siblings.

Q. Okay. Does [J.L.] understand that the two daughters in the [maternal relatives'] care are half siblings? A. Probably not.

Q. Does [J.L.] also have an older half brother here in Dubuque? A. I'm not aware of that child.

Q. Have you asked? A. I have not.

Q. If he knows him, sees him, and is happy with him, is that something that you would think is important to [J.L.]? A. Sure. Yes.[14]

And, like the juvenile court, we find it concerning that the adoption selection committee chose to ignore the report of a certified therapist because the department did not request her opinion. If DHS doubted her opinion, it could have sought out another professional of its own choosing. And in fact, it may have been required to do so, as DHS's "Iowa Adoption Selection Staffing Process" outlines that the adoption worker and the adoption worker's supervisor "will . . . [r]equest . . . input from interested parties, which may include but are not limited to . . . [the] child therapist."

In this case, a therapist, the child's pediatrician, the GAL, and the CASA all expressed concern if J.L. was to be removed from the foster parent's care and sent to his maternal relatives, with whom he was not bonded and did not know. These are opinions DHS was required to consider. That is not to say DHS is bound to follow the opinions of these individuals—the adoption selection committee is not charged with counting noses. *See, e.g.*, *Tomer v. Aiken*, 101 N.W. 769, 771 (Iowa 1904) ("The value of expert opinion cannot be determined by counting noses, and, even though six physicians took one view and but one the other, the issue was for

---

[14] The foster parent testified that J.L. had strong relationships—he saw his half-sister every day at daycare and his older half-brother a couple times each month.

the jury to decide."). But, because DHS made a decision that was at odds with the opinion expressed by each and every professional involved in the case, we would expect a reasonable decision-maker to be able to explain why those opinions were not persuasive and what DHS actually relied on to make its choice. Yet the adoption worker was unable to explain what weight—if any—these opinions were given and could not explain on what the committee relied to choose the maternal relatives. Plus, once DHS chose the maternal relatives, its transition plan for J.L. was also unreasonable. *See I.P.*, 2019 WL 3317922, at *3 (noting a transition plan that is "done properly, slowly, and with the support of all of the adults in the child's life" can result in a successful transfer).

At the end of the day, what became apparent to the juvenile court and now to us is that DHS decided early on that it would select the maternal relatives as the adoptive placement once the termination of the parents' rights was completed. DHS relied upon a position it believed trumped all other considerations—that siblings should be raised together. Once in that trench, DHS ignored its own requirements and did not follow the protocol that ensures a consideration of the current and potential best interests of this child.[15] The DHS rules that guide the process contemplate an in-depth analysis that balances the familial relations, the child's specific needs, and, in the end, the best interests of that child. The selection staffing process must, then, involve more than a simple application of the basic rule that a child's pre-adoption placement must always be biological family (when

---

[15] Based upon the testimony of the adoption worker, we are left with this conclusion, unlike *T.M.*, where we could confirm that "the lengthy statement given by DHS in support of its decision shows the decision to move [the child] [to the aunt's home] was not made lightly." 2018 WL 5840806, at *5.

biological family is available). If that were the go-to rule, there would be no need for the required balancing analysis the selection process requires. Thus, our test is whether DHS failed in its guardianship duties or in looking out for the child's best interests. *See S.O.*, 2013 WL 3458216, at *2. With a tunnel-vision approach, DHS traveled one path without a full view of the other factors impacting the child's best interests. We agree with the juvenile court that the GAL and foster parent met their burden to show DHS acted unreasonably in discharging its duty as J.L.'s guardian and removing DHS as his guardian was in the child's best interests. Once the court removed the guardian, it had to appoint another guardian under section 232.117(3), and we see no error in appointing the foster parent.

We affirm the removal of DHS as J.L.'s guardian under section 232.118(1) and affirm the appointment of the foster parent instead. *See* Iowa Code § 232.117(3).

**AFFIRMED.**

Bower, C.J., concurs; Badding, J. specially concurs.

**BADDING, Judge** (specially concurring).

I join in the court's well-reasoned opinion but write separately to emphasize the difference between this case and the many others where we have refused requests to remove the Iowa Department of Human Services as the guardian of a child because a prospective adoptive parent disagrees with the department's placement decision. *See In re J.H.*, No. 20-0081, 2020 WL 2988758, at *10 (Iowa Ct. App. June 3, 2020) (Ahlers, J., specially concurring) (collecting cases). The common denominator among those cases is the thorough, thoughtful, and detailed decision by the department in selecting an adoptive family that will be in the child's best interests. *See, e.g.*, *In re E.G.*, 745 N.W.2d 741, 742 (Iowa Ct. App. 2007) (noting that in selecting an adoptive family in California over a foster parent in Iowa, the "record is clear the [d]epartment conducted a very thorough search process"); *In re T.J.M.*, No. 18-1390, 2018 WL 5840806, at *5 (Iowa Ct. App. Nov. 7, 2018) (discussing the "lengthy statement given by [the department] in support of its decision," which showed its decision to move the child to the home of a maternal aunt "was not made lightly"); *In re I.P.*, No. 19-0715, 2019 WL 3317922, at *3 (Iowa Ct. App. July 24, 2019) (relying upon the careful assessment by the department that considered the child's "emotional and developmental well-being" and ability to form attachments and bond with the chosen placement). Here, we have the exact opposite.

The unreasonableness and irresponsibility of the department in discharging its guardianship duties is starkly apparent from the testimony of the adoption social worker. As the majority opinion points out, although she had been specializing in adoptions for the department since 2009, she couldn't "think of a specific topic or

training that [she had] been to in regards to adoption at the moment." When asked whether she was "aware that there are administrative rules in the Iowa code with regard to . . . what factors you're supposed to look at in an adoption screening," the worker responded: "I would assume there are codes. I haven't looked at them recently." The worker's cavalier attitude toward the process continued when she was asked what the team's selection was based on. She obliquely answered that it was "[b]ased on the consensus of the team" and could not recall whether the team actually talked about the child at their conference, instead just pointing to their desire "for him to be placed with family and with siblings."

In reaching this consensus, it was clear the selection committee elevated the worker's understanding that "keeping siblings together is a priority" over an individualized assessment of *this* child's particular needs. *See* Iowa Admin. Code r. 441-200.4(3)(a) ("The child's special needs, characteristics, and anticipated behaviors shall be reviewed in the conference to determine a family that can best meet the needs of the child."). Although "[b]oth statute and case law emphasize the importance of sibling relationships," *I.P.*, 2019 WL 3317922, at *4, that preference yields to the child's best interests. Iowa Admin. Code r. 441-200(3)(b)(1). The department did not give consideration to the child's best interests in this case, ignoring the opinion of the guardian ad litem, court-appointed special advocate (CASA), the child's pediatrician, and a therapist certified as an expert in childhood development in favor of its sibling preference. To not even remember whether the child was discussed at a conference that should have been focused on a "thorough assessment of [the] child's current and potential

developmental, medical, emotional [and] educational needs" is unreasonable and irresponsible.

The decision in this case should not be interpreted as this court approving the juvenile court's selection of a specific placement for the child or endorsing a preference to keep the child in a long-term foster care placement. *See I.P.*, 2019 WL 3317922, at *5 (stating that "providing a good foster home does not create a legal ground to remove the [department] as guardian after termination" because "if every foster parent who formed a bond with a child were given enforceable rights to the child, it would upset the goals of the system" (cleaned up) (citation omitted)). It is instead the failures detailed in the majority opinion that show the department did not "act in the child's best interest by unreasonably or irresponsibly failing to discharge the guardian's duties in finding a suitable adoptive home for the child." *J.H.*, 2020 WL 2988758, at *10 (Ahlers, J., specially concurring); *see also I.P.*, 2019 WL 3317922, at *5 (noting the "overarching goal" of the adoption selection process is to safeguard the child's best interest).

With these clarifications, I join in affirming the removal of the department as this child's guardian and appointment of the foster parent.